LEVERETT M. FRANCIS AND ANNA C. FRANCIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Francis v. Commissioner
Docket No. 22969-90
United States Tax Court
T.C. Memo 1992-462; 1992 Tax Ct. Memo LEXIS 491; 64 T.C.M. (CCH) 495; August 17, 1992, Filed As Corrected August 17, 1992. *491 Decision will be entered under Rule 155. For Petitioners: Steven M. Chamberlain, For Respondent: Steve R. Johnson. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies and additions to tax for fraud in petitioners' Federal income taxes as follows: Additions to tax
Year
Deficiency
Sec. 6653(b)
1977
$ 8,215.34 $ 5,775.17 1978
83,887.32
49,405.66
1979
95,130.00
47,565.00
1980
86,903.67
44,090.14
After concessions, the issue for decision is whether petitioners are liable for additions to tax for fraud under section 6653(b) for 1977 through 1980. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. The deficiencies for these years are not in dispute and are purely computational. Petitioners, Leverett M. Francis and Anna C. Francis, resided in Keystone Heights, Florida, at the time they filed their petition. During the *492 years at issue, petitioners were husband and wife. References to petitioner in the singular are to Leverett M. Francis. Since their marriage in 1946, petitioners have filed joint Federal income tax returns. All of the returns were prepared by petitioner, except for the amended 1977 and 1978 returns and the original 1979 return which were prepared by the Internal Revenue Service (IRS). Petitioners maintained joint bank accounts during the years in issue. Petitioner is a college graduate. He was a pilot in the United States Navy for 21 years and retired with the rank of lieutenant commander. He had an FAA-issued pilot's license. During the years at issue, he was a commercial pilot and a narcotics smuggler. Petitioner Anna Francis (Mrs. Francis) is a high school graduate. From the early 1960's to the early 1970's, Mrs. Francis operated a laundry and dry cleaning business with her husband. From the early 1970's through the years at issue, Mrs. Francis operated an antique business. Mrs. Francis knew her husband was smuggling drugs when petitioners filed their 1978 and 1979 tax returns. Petitioner was engaged in narcotics smuggling activities from the fall of 1977 until 1980. *493 He flew loads of marijuana and cocaine from Colombia to the Bahamas and from the Bahamas into the United States. He derived taxable income in cash for the above-mentioned flights. Petitioner was paid between $ 25,000 and $ 100,000 per flight based on the type of load being flown and the destination of the flight. In October 1979, petitioner was approached by United States Drug Enforcement Agency (DEA) Agent Douglas Driver (Agent Driver) and Florida Department of Law Enforcement Agent Joseph Ubelher (Agent Ubelher). The agents convinced petitioner to provide testimony against his drug smuggling associates. In exchange for his assistance, petitioner was granted immunity from criminal prosecution, which included immunity from prosecution for IRS criminal violations. The agreement, which was put in writing in a letter given to petitioner in October of 1979, was contingent on petitioner's telling the truth about his activities, including accurately reporting all of his income to the IRS and paying taxes thereon. The letter did not mention civil tax liability. Petitioner's FAA-issued pilot's license was not revoked even though he was a known narcotics smuggler who not only participated *494 in drug flights but, on occasion, also piloted some of the flights. The investigation, which involved the DEA, the IRS, and other Federal and State law enforcement agencies, had been ongoing for approximately 18 months before the DEA agents approached petitioner. Petitioner met with the DEA agents and other Government representatives on numerous occasions and provided extensive information to them about his smuggling activities. After he began to cooperate with the DEA, but before his first appearance before the grand jury, petitioner requested assistance (i.e., customs clearance) from the DEA in bringing approximately $ 88,000 in currency into the United States. This money was known by the DEA to be earnings from illegal drug smuggling. The request was denied. Nonetheless, petitioner brought the money into the United States and showed it to the DEA agents. The DEA agents photographed and fingerprinted the money and then returned it to petitioner. Petitioner testified before a Federal grand jury in February and July of 1980. During his grand jury testimony, petitioner testified that he had earned "a couple of hundred thousand dollars" from cocaine runs. Actually, petitioner *495 earned $ 300,000 from cocaine smuggling. His earnings from marijuana smuggling were even more substantial. After testifying before the grand jury in February of 1980, petitioner was introduced to IRS Revenue Agent Michael Marr (Agent Marr) by Agent Driver and another DEA agent. The meeting was set up so that Agent Marr would have petitioners' tax returns prepared. Such introduction took place in the back seat of Agent Driver's car. In March of 1980, petitioner met with Agent Marr and Revenue Agent Monica Baker (Agent Baker) on three occasions at an IRS office in Jacksonville, Florida. At the first meeting, petitioner provided the IRS agents with various books and records, copies of petitioners' original 1977 and 1978 returns, and oral information as to income and deductions for 1977, 1978, and 1979. After the meeting, the agents prepared amended returns for 1977 and 1978 and the original return for 1979. At the second meeting, the IRS agents presented the returns to petitioner. Petitioner took the returns home and told Mrs. Francis the IRS had prepared the returns and that "We are in good shape. Sign them." At the third meeting, petitioner gave the IRS agents the returns, *496 each of which he and his wife had signed, and also made payments with respect to the liabilities shown on them. Petitioners' original returns for 1977 and 1978 were timely filed. Petitioner received income in both of those years from drug smuggling but reported none of it on the original returns. On the amended returns for 1977 and 1978, petitioner reported income from drug smuggling in the amount of $ 15,000 and $ 50,000, respectively. He reported $ 45,000 of income from drug smuggling on the 1979 return. Petitioner failed to report $ 90,000 of income from marijuana smuggling activities received in 1980. The actual amounts of gross income received by petitioner from drug smuggling activities were $ 50,000, $ 115,000, $ 390,000, and $ 90,000 for 1977, 1978, 1979, and 1980, respectively. Petitioner intentionally excluded the unreported income from his tax return. No business deductions were claimed on any of the returns with respect to the smuggling activities. Petitioner incurred various expenses which would have been deductible if they had been claimed. He did not, however, keep adequate books and records to substantiate his right to claim such deductions. The parties *497 have stipulated that petitioners are allowed $ 5,000 in business deductions for each of the 4 years at issue. After taking the business deductions and deducting for the amounts already reported on their original and amended returns, the parties agree that petitioners underreported their taxable income in the amount of $ 30,000, $ 60,000, $ 340,000, and $ 85,000 for 1977 through 1980, respectively. In 1988, petitioner testified in the criminal drug case United States of America v. Carlos Enrique Lehder-Rivas and Jack Carlton Reed, No. 81-82-CR-J-12 (M.D. Fla. May 20, 1988) (Lehder trial). Before trial, petitioner met with Government agents and after considerable effort by the agents, he finally stated that his total income from drug smuggling was $ 545,000. This amount is in fact $ 100,000 less than his actual gross drug smuggling income. Before testifying at the Lehder trial, petitioner asked defense counsel not to go into his finances and taxes at trial. He also asked drug enforcement agents and the U.S. Attorney to intercede on his behalf with the IRS so that he would not be charged with the back taxes he owed. His requests were ignored. In 1988 (after the Lehder trial), *498 Revenue Agent Patrick O'Neill (Agent O'Neill) met with petitioners at their home in Keystone Heights, Florida, and informed them that the IRS would be proposing deficiencies in their 1977 through 1980 Federal income tax returns based upon petitioner's testimony in the Lehder trial. Petitioners were uncooperative about the extent and location of their assets. They refused to identify all of their bank and stock accounts and to provide details about funds held overseas. At the end of the meeting, Mrs. Francis told Agent O'Neill she would burn the house down before allowing the Government to take it. Between 1979 when petitioner was first approached by Agent Driver and Agent Ubelher and 1988 when he met with Agent O'Neill, petitioner had over a dozen meetings with Government officials at which he was repeatedly asked about the number of drug flights he made and the amount he was paid for the flights, yet he never fully disclosed the truth. Petitioners concealed the extent of their assets by moving assets overseas, holding assets in untraceable forms, and putting assets in whole or in part in other people's names. OPINION Respondent determined that petitioners are liable for the *499 addition to tax for fraud under section 6653(b) for 1977 through 1980. The existence of fraud under section 6653(b) is a question of fact to be determined upon consideration of the entire record. . Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); , affg. . The primary question in determining whether fraud is present is whether there has been an intentional wrongdoing on the part of the taxpayer with the specific intent of evading a tax known or believed to be properly owing. , affg. ; , revg. ; [1]. *500 Where fraud is determined for more than 1 year, respondent's burden applies separately for each year. [2] To satisfy her burden of proof, respondent must show two things: (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. ; . The first of these elements is not in controversy since the understatements of taxable income by the petitioners on each of the returns in question is stipulated. Thus, this case turns on the element of fraudulent-intent. Fraudulent intent will never be imputed or presumed. , *501 affg. ; However, direct proof of a taxpayer's fraudulent intent is rarely available. Consequently, fraud may be proved by circumstantial evidence drawn from the entire record. ; . Over the years, courts have developed various factors, or "badges", which tend to establish fraud. . These include, for example: (1) A pattern of understatement of income; (2) inadequate books and records; (3) concealment of assets; (4) failure to cooperate with Government officials; (5) income from illegal activities; (6) attempting to conceal illegal activities; and (7) dealing in cash. See generally , affg. ; ; , affd. . *502 These badges of fraud exist in this case as to petitioner and Mrs. Francis. The parties stipulated that petitioners understated their income on their tax return by $ 30,000 for 1977, $ 60,000 for 1978, $ 340,000 for 1979, and $ 85,000 for 1980. The underreporting that persisted for 4 years was substantial. Repeated understatements in successive years, when coupled with other circumstances showing an intent to conceal or misstate taxable income, present a basis on which we may properly infer fraud. , affg. ; , affg. on this issue . During the years at issue, petitioner knowingly and intentionally understated his income to evade tax. The omitted income was from an illegal activity -- drug smuggling. Petitioner repeatedly made false statements, to Government officials and while testifying under oath, with the intent of concealing his true drug smuggling income. He continued to engage in these activities even while appearing to cooperate with law enforcement *503 officers. Petitioner dealt in large amounts of cash and failed to cooperate with the Internal Revenue Service and other Government officials. Finally, petitioner concealed the extent of his assets by moving assets overseas, holding assets in untraceable forms, and putting assets in part or in whole in other people's names. We turn now to Mrs. Francis. Fraud is not imputed from one spouse to another. Even in the case of a joint tax return, respondent must prove fraud as to each spouse charged with liability for the addition to tax. Sec. 6653(b); , affd. . Consequently, respondent must separately prove fraud as to Mrs. Francis. The sophistication of the taxpayer is relevant to the determination of fraud. , affg. . Mrs. Francis is a high school graduate who has had approximately 20 years of experience running two different businesses. With respect to the determination of the fraud addition against Mrs. Francis, respondent has relied on several indicia of *504 fraud. Mrs. Francis knew about her husband's illegal income at the time all the returns at issue were filed. In 1977, Mrs. Francis traveled with her husband's drug smuggling associates including Ed Ward. Mrs. Francis signed an affidavit given to Agent O'Neill on August 3, 1988. The affidavit begins as follows: Ed Ward told me Lev (petitioner) was going to start flying narcotic (sic) load for him + (and) I just laughed since Lev (petitioner) didn't even smoke or drink and was contrary to religious beliefs. I didn't find out about it till after Lev (petitioner) was already involved + (and) had flown several loads. At least I didn't want to believe it. Nonetheless, Mrs. Francis testified that she did not learn of her husband's smuggling until after the 1977 return was filed. We find Mrs. Francis' testimony implausible. It is clear from the record that Mrs. Francis was put on notice from the beginning that her husband was going to smuggle narcotics. Notwithstanding the fact that she did not want to believe it, we find that Mrs. Francis knew her husband was engaged in drug smuggling at the time the 1977 return was filed. Mrs. Francis admits she knew her husband was engaged *505 in drug smuggling at the time the 1978 and 1979 returns were filed. At the time the 1980 return was filed, Mrs. Francis again testified that she did not know her husband was engaged in drug smuggling. However, in an interview with Agent O'Neill on August 3, 1988, she admitted that she knew at the time the 1980 return was filed that her husband had been involved in drug smuggling and that the income from the smuggling was omitted from their return. Given the inconsistencies and contradictions in Mrs. Francis' testimony, we find Mrs. Francis knew her husband was engaged in drug smuggling at the time the 1980 return was filed. The omitted income was from an illegal activity: drug smuggling. Mrs. Francis dealt in large amounts of cash. Mrs. Francis showed her failure to cooperate with Government officials when she said she would burn the house down before allowing the Government to take it. Finally, she participated in the concealment of their assets. Notwithstanding the above, petitioners contend that at the time of filing their original 1977 and 1978 returns they believed that they had no obligation to report their illegal income. We do not believe this. [3]
*506 Petitioners also contend they omitted part of the illegal income because petitioner had or thought he had a deal under which the Government would "wink" at their underreported income in exchange for his cooperation and testimony against his drug smuggling associates. Respondent correctly asserts that petitioner's perception about the existence of a deal could not affect the original returns for 1977 and 1978 because they were due and filed before petitioner had any contact with Government agents. [4] The alleged deal, however, is relevant to the 1979 and 1980 returns.
Petitioner admits that the alleged deal was never put in writing and that no Government official ever expressly told him he could underreport his drug income. He also testified *507 that he never received any assurance of any kind in respect to civil tax immunity and that the existence of a deal was something he had inferred. We find that no deal existed which allowed petitioners to report only a small part of the drug smuggling income. Moreover, petitioners continued their deceptive handling of cash and their strategy of asset concealment well past the time the alleged deal was struck. This shows that petitioners did not genuinely believe they had a deal which allowed them to omit part of their drug smuggling income. Petitioner was told several times by various Government agents that he had to report all of the drug smuggling income. Petitioner never mentioned the alleged deal to Agent Marr, the agent who prepared the amended 1977 and 1978 returns and the original 1979 return. In addition, before testifying at the Lehder trial, petitioner asked the Lehder defense attorneys not to question him about his finances and taxes. If petitioner really believed he had a deal, he would have just said: "I have a deal with the Government which permits me to underreport my income so go ahead and ask me about my finances and taxes." His behavior is not congruent with *508 his belief that a deal existed. Mrs. Francis also did not genuinely believe that they had a deal. During the years at issue, she never talked with Government agents about the alleged deal. Hence, it is clear that any information she had about the deal came from her husband, whom she knew to be a lawbreaker. We doubt that someone with her education and business experience would accept a story that they were "in good shape" without first discussing or asking questions about the alleged deal. Petitioners' account of the alleged deal is not credible. Consequently, we hold petitioners did not genuinely believe they had a deal with the Government to underreport their income. Based on the entire record, we conclude that respondent has clearly and convincingly carried her burden of proving petitioners' fraudulent intent. We hold that petitioners' underpayments of taxes during taxable years 1977, 1978, 1979, and 1980 were due to fraud. We have considered petitioners' other arguments and find them without merit. To reflect the foregoing and the mutual concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. In (llth Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit (to which an appeal in this case would lie) adopted as precedent all decisions of the former United States Court of Appeals for the Fifth Circuit prior to Oct. 1, 1981.↩
2. (citing , affd. sub nom. .↩
3. In , on which petitioners rely, the taxpayers possessed no knowledge of rudimentary business practices and only had a ninth-grade education. However, the taxpayers in Bartlett cooperated with respondent's agent and voluntarily admitted income they had forgotten to report. In our case, one petitioner is a high school graduate and the other completed college, both have knowledge about business practices, and neither cooperated with respondent's agents. Consequently, Bartlett↩ is not applicable to the case at hand.
4. Once a fraudulent return has been filed, the case remains one "of a false or fraudulent return," regardless of the taxpayer's later revised conduct for purposes of civil fraud liability under sec. 6653(b). .↩